**United States District Court**
**For the Northern District of New York State**

U.S. DISTRICT COURT - N.D. OF N.Y.

FILED

APR 20 2001

AT _____ O'CLOCK _____
Lawrence K. Baerman, Clerk - Syracuse

United States of America

# ORIGINAL

*Amended*

**Ex. Rel., Hedy M. Cirrincione President**
CREST Mainstream, Inc.

Watertown, New York

Plaintiffs

vs.

**Mr. Larry D. Tingley, Individually**
and as **Director** of
Jefferson County Community Services Board
175 Arsenal Street
Watertown, New York 13601

Jefferson County Community Services Board
175 Arsenal Street
Watertown, New York 13601

Jefferson County
175 Arsenal Street
Watertown, New York 13601

Ogdensburg City School District
State Street
Ogdensburg, New York 13369    and

Mr. William Smith, Individually and as
NYS DSS Specialist, Medicaid Reimbursement in Education
7 Bethwood Drive
Loudonville, New York 12211

Defendants

Complaint and Demand for Jury Trial

**7: 98 c v 1929**

Qui Tam
Civil Action No.: _____
Date Received: _____
Time: _____
Original Complaint filed In Camera
Under seal
Sealed pursuant to 31 U.S.C.
section 3730 (b)(2).

AMENDED    April 20, 2001

_____

U.S. DISTRICT COURT

*Exbits appear with
original - unchanged*

## Disclosure Statement of Hedy M. Cirrincione

Comes now Hedy M. Cirrincione and states that the following facts are true and correct and are based upon my personal knowledge.

This disclosure statement contains confidential and privileged information including mental impressions, conclusions, opinions, and legal theories of counsel, that is being provided to the Government as a joint party with common interests.

*PRIVILEGED AND CONFIDENTIAL*

3

2.　　The New York State Education Department (NYSED) implemented the School Supportive Health Service Program (SSHSP) and developed policy and procedural guidelines to enable "Providers" (School Districts, County Agencies and Individual Practitioners) access to Medicaid reimbursement under Federal Medicaid regulations (42 CFR § 440.110(c)) for "health services" provided for eligible students referred by school districts. **Exhibit A (2)**

3.　　Upon application, Medicaid issues "Provider" billing numbers to agencies or individuals to establish "Provider" status. The "Provider" often employs or contracts with the Health Care Professionals (HCP) (occupational, physical and speech therapists) who perform certain diagnostic and Health Support Services (HSS) for preschool and school age students with or suspected of having disabilities.

4.　　Typically, Medicaid services are supplied in conjunction with a medically based entity. In the present instance, however, NYSED Policy and Procedure provides a vehicle to access Federal Medicaid Reimbursement in conjunction with Educational Programs. Although the policy clearly mandates assurances *"that services are medically appropriate, i.e., the services are intended to meet a medical need, as opposed to needs which are clearly only social, recreational or educational,"* "Providers" blatantly ignore that requirement and other requirements which mandate that HRSS must be provided by or "under the direction of" certain qualified licensed professionals including physicians (MD), speech pathologists, physical therapists and occupational therapists. **Exhibit A(3)**

5.　　As mandated by NYSED, school districts convene the committees on special education (CSE) to determine the special educational needs of students referred. The CSE recommends HRSS as necessary for the special education of the student. The HRSS are delivered as outlined on the student's Individual Education Plan (IEP). Although there is a section on the IEP for medical needs, HRSS are not entered on that section when they are not medically based. **Exhibit A(4)**

6.　　HCP's employed or contracted by "Providers" are required to submit attendance or service records to the "Provider". **Exhibit A(5)** The "Provider" uses the service records to bill the Federal Medicaid Program. The Medicaid funds generated are 50% Federal and 50% state. The NYSED receives 75% and the "Provider" receives 25% of the Medicaid reimbursement.

*PRIVILEGED AND CONFIDENTIAL*

County Youth Bureau, Mr. Larry Tingley, and myself at which time we discussed future staffing in order for Jefferson County to bill Medicaid for preschool services under NYSED policies and procedures that were scheduled for implementation July 1, 1993. **Exhibit C(1)**

## 1993

11. **May 12, 1993**, Mr. Tingley generated a memo stating the need for preschool services for children with disabilities and included vague guidelines of the credentials and records required of the contractors by NYSED and Jefferson County. **Exhibit D(1)**

12. **September 20, 1993**, the New York State Department of Social Services (NYSDSS) distributed amended forms, (provider agreement between NYSDSS and preschool service providers and statement of reassignment) *"to facilitate compliance by the service providers"*. **Exhibit D(2)**

13. **October 22, 1993**, Mr. Tingley sent a memo requesting completion of the "reassignment of benefit forms" and enclosed the NYSED guidelines for Health Related Support Services. The guidelines clearly state the services must be medically necessary to qualify for Medicaid reimbursement. **Exhibit D(3)**

14. **December 27, 1993**, Mr. Tingley generated a memo to announce that on January 1, 1994, Ms. Ginny Harrington would *"assume responsibility"* of supervising the preschool children with disabilities program for the Jefferson County Community Services office. **Exhibit D(4)**

## 1994

15. **March 29, 1994**, Ms. Harrington requested attendance (service) records for July and August 1992. She stated *"we are able to seek (Medicaid) reimbursement for speech, occupational, and physical therapies provided for eligible children both as related services and as part of your preschool program"*. **Exhibit E(1)**

16. **May 1994**, the NYSED generated revised contract language to include Medicaid requirements. **Exhibit E(2)**

*PRIVILEGED AND CONFIDENTIAL*

6

17.     **August 5, 1994**, Ms. Harrington requested "Health Related" service dates for the period of July 1, 1992 to June 30, 1993. In a subsequent telephone conversation with Ms. Harrington, she told me that a speech pathologist was necessary in order to bill Medicaid for speech services. I explained that we did not employ a speech pathologist at that time. She then told me that I did not need to submit the attendance records for services provided by speech teachers because she couldn't bill for them. **Exhibit E(3)**

18.     **December 9, 1994**, I submitted a billing voucher for "off-site" related speech services provided by speech teachers. The service period was May - August 1994. All attendance records, therapist signatures and professional credentials had been submitted at that time or previously.

## 1995

19.     **March 10, 1995**, I wrote to Mr. Tingley to follow up on a telephone conversation I had with Jefferson County Community Services employee, Lori Parker. She had stated that the $9,900.00 voucher for speech (teacher) services would not be paid until further (Medicaid) documentation had been provided. I reiterated the information Ms. Harrington shared i.e., speech services are not reimbursable under Medicaid unless provided by a speech pathologist and pointed out our providers were speech teachers. I then referred her to the professional certificates, she had previously obtained, for our staff. **Exhibit F(1)**

20.     **March 13, 1995**, I had a telephone conversation with Mr. William Smith, Project Assistant for Medicaid in the Educational System, 74 State Street, Albany, New York, 12207 regarding Medicaid guidelines for speech services. He explained the regulations and policies of the NYSED, which confirmed the information Ms. Harrington had relayed to me in August 1994 and which was clearly stated in the NYSED School Supportive Health Services Policy distributed by Mr. Tingley on October 23, 1993. Specifically, unless speech services were provided by or under the direction of a speech pathologist, they were not reimbursable.

21.     **March 15, 1995**, Mr. Tingley wrote a letter to me indicating that I had agreed to provide service records under the terms of the 1993-1994 contracts. He further wrote that my statement regarding Medicaid reimbursement for speech services was not correct but offered no

correction or clarification. He went on to say that he would process my claim after he received CREST's speech service records. **Exhibit F(2)**

22.    **June 16, 1995**, Mr. Tingley again requested speech, physical, and occupational therapy service records for 1993-1994. He indicated that he needed them before the end of June in order to submit them to Medicaid before the billing deadline. **Exhibit F(3)**

23.    **June 26, 1995**, Mr. Tingley submitted New York state Medical Assistance (Title XIX) Program Claim Forms (A) for speech services provided by speech teachers employed by CREST. According to a letter dated July 11, 1996 (in response to a FOI request I made), Mr. Tingley stated *"we do not find a listing of speech therapy services having been provided by you to this office. In the absence of the requested records from you (6/26/95), we applied our best efforts in constructing a record of speech services which was filed to the Medicaid office to meet statutory deadlines."* In this letter, he admits to construction of billing documents for the 1993-1994 school year. **Exhibit F(4)(5)**

24.    Although Mr. Tingley submitted false documents June 26, 1995, it was not until I obtained copies of the documents under the Freedom of Information Law on July 11, 1996, that I became aware of his illegal actions:

25.    **August 21, 1995**, Mr. Tingley telephoned me to request unspecified financial records of my Corporation and the telephone number of CREST's CPA, Sherry Furgison. I specifically told him not to contact CREST's accountant directly and to submit all requests for information to me in writing .

26.    **August 22, 1995**, Thomas Hamel Chief Director, Special Education, NYSED Rate Setting Unit (PSRU) sent a letter to Thomas Neveldine requesting an unannounced visit to CREST

secondary to information obtained by telephone from the Jefferson County Representative (Larry Tingley). **Exhibit F(6)**

27.    **August 22, 1995**, Sherry Furgison, CPA, telephoned me to relay that she had been called by CPA, Jack Vanesky, at the request of Mr. Larry Tingley at which time he asked many questions non-related to the corporation regarding my personal finances.

*PRIVILEGED AND CONFIDENTIAL*

28.    **August 28, 1995**, Ms. Jean Bilow, Director of Jefferson County Public Health Nursing at the request of Mr. Tingley, telephoned Samaritan Medical Center Vice President of Finance, Lyle Eaton, and later Samaritan Keep Home Administrative Assistant, Beth Morris, to question my personal earnings at those facilities, as well as hours worked and rate of pay. (transcript available)

29.    **August 28, 1995**, In a telephone conversation I had with Mr. Tingley, he indicated that CREST might be at risk for losing it's NYSED 4410 preschool certification and that I would, as a result, loose all Jefferson County contracts that my company relied on. I indicated that the Itinerant Services and Early Intervention contracts were separate from the 4410 preschool and that there would be no reason for loss of the contracts. He continued to state that if CREST lost its certification, the County would fail to have faith in the services provided under separate contracts and would ultimately cancel remaining agreements or refuse to renew them. I immediately questioned his motives for such statements and asked if he was threatening me.

30.    **August 31, 1995**, Mr. Tingley wrote to NYSED PSRU, commented on CREST's 1992-1993 financial reports, offered information without factual basis and requested a NYSED audit of CREST's school.

31.    **October 5, 1995**, Mr. Tingley wrote to NYSED PSRU accountant, Bruce Jesiolowski, to provide additional comments on CREST's rates and financial reports for 1992-1993. He also again requested an audit of CREST by NYSED.

32.    **October 23, 1995**, Ms. Sherry Furgison, CPA, sent me a letter summarizing the questioning by CPA, Jack Vanesky at the direction of Mr. Tingley. **Exhibit F(7)**

33.    **October 26, 1995**, I wrote to Mr. Tingley noting that annual provider agreements for the year beginning July 1, 1995, had not been received. Contracts were not received until January 1, 1996. **Exhibit F(8)**

34.    **November 17, 1995**, Mr. Tingley wrote to me to reject billing submissions stating they did not meet previously provided billing guidelines. **Exhibit F(9)** In a letter dated December 29,

*PRIVILEGED AND CONFIDENTIAL*

1997, I reiterated the contents of a December 19, 1997 telephone conversation at which time I requested copies of JCCSB policies and procedures governing 4410 Preschools, Preschool Related Services and Early Intervention services. I was told at that time, there were no policies and procedures maintained by the department. **Exhibit F(10)**

## 1996

35.      **January 29, 1996**, 1994-1995 and 1995-1996 contracts were received to be executed. **Exhibit G(1)**

36.      **March 11, 1996**, A newspaper article in the Watertown Daily Times, states that Jefferson County served 260 handicapped preschool children at a cost of $ 2.47 million. It approximated $ 1.63 million of Medicaid coverage with $ 844,000.00 remaining of which 59.5% would be paid by New York State. **Exhibit G(2)**

37.      **April 10, 1996**, Mr. Tingley wrote to NYSED PSRU to offer comment on CREST's 1993-1994 cost report. He provided information not based in fact.

38.      **May 3, 1996**, I called William Smith, of the NYSED Medicaid Unit and again questioned the requirements for reimbursement under Medicaid particularly for speech services. He questioned my motives and keen interest in adherence to the regulations. He also questioned, *"Why would you jeopardize your contracts with the County by disclosing this information?"*. I told him *"My contracts have nothing to do with Medicaid billing."*. There was a long silence. Then I said, *"Oh, I'm a little slow today. You're saying that if I* ***"blow the whistle"*** *on Tingley, I'll lose my contracts?"* He replied, *"Well stranger things have happened."* I then asked him how I could actually determine if Jefferson county had, in fact, billed Medicaid for services that were not reimbursable. He explained that Medicaid remittance statements and claim forms might be obtained under the Freedom of Information Act (FOI).

39.      **June 1996**, I telephoned the Medicaid Office of NYSED and spoke with Mr. D'Agostino. I relayed my concern regarding fraudulent Medicaid billing by Jefferson County. I requested assistance and advice from his office. I went on to say that I had retained an attorney because I was sure Mr. Tingley would "blame me" for any impropriety.

*PRIVILEGED AND CONFIDENTIAL*

40.    **June 25, 1996**, I submitted a FOI request to obtain Medicaid billing documents. **Exhibit G(3)**

41.    **July 11, 1996**, Medicaid remittance documents I obtained, under FOI, had names of students from other agencies redacted. Although I could not read the names, I became aware that Mr. Tingley also illegally billed Medicaid for speech and other services provided by Jefferson Rehabilitation Center, Jefferson County Head Start and individual providers.

42.    It occurred to me that school districts, including Jefferson-Lewis BOCES and County agencies across New York State have been billing Medicaid for school based referrals for speech, occupational, and physical therapy despite the fact services are clearly "educational" in nature. I telephoned several school districts to investigate the qualifications of personnel used to bill Medicaid. I also made a February 1997 telephone call to the NY State Ways and Means Committee, who reported NYSED would receive an estimated $10 million dollars in Medicaid revenue that year.

43.    **July 14, 1996**, I met with Mr. William Smith (now retired and a private consultant) in Albany, New York at which time I disclosed information and asked questions regarding Jefferson County's and Ogdensburg City School District's Medicaid billing practices. He suggested that because I "had something" on Mr. Tingley, and if I revealed my knowledge to Mr. Tingley he might be willing to be more cooperative toward me. I replied *"That's extortion"*. He had also told me that he had "quelled an incident in St. Lawrence County". As a result of our meeting, I wrote to Mr. Scalise and other agencies. **Exhibit G(4)**

44.    **July 16, 1996**, I wrote to Mr. Scalise, NYSED Office for Special Education Services to request written clarification regarding speech therapy under Medicaid guidelines. I copied the letter to Mr. Hagemann, Jefferson County Administrator, Michael Looby, Esq., Jefferson County Attorney, Mr. Tingley, and Joseph D'Agostino, New York State Department of Social Services. **Exhibit G(5)**

45.    **July 16, 1996**, I wrote to the Jefferson County Attorney's office to inform them that I had not received the 1995-1996 or 1996-1997 executed contracts. **Exhibit G(6)**

*PRIVILEGED AND CONFIDENTIAL*

46. **July 29, 1996**, I received a letter from Mr. Larry Tingley in response to my July 1, 1996 letter to JCCSB to requesting the "back side" of the insurance claim forms which providers are required to sign. The "back side" includes instructions, assurance statements, and certification descriptions. It was my belief that assurances on the "back side" were intentionally withheld as an act of deception due to fraudulent billing practices. **Exhibit G(7)**

47. **July 30, 1996**, I wrote to NYSED regarding implications of expired County contracts mandated by them. **Exhibit G(8)**

48. **July 30, 1996**, I wrote to the Inspector General to follow up on a Medicaid Fraud Hotline complaint made by telephone July 30, 1996. **Exhibit G(9)**

49. **August 1996**, I spoke with Mr. Scalise regarding the fraudulent billing at which time he questioned me. He asked why I had contacted federal authorities. I explained that I didn't know who to contact so I contacted NYSED, his office, NYS officials and federal officials. At that point, I realized that his office developed the billing practice and I had just disclosed to the perpetrators the course of investigation. I had contacted federal authorities because I feared there would be a cover-up at the state and local level.

50. **August 21, 1996**, I wrote to Mr. Scott Schrader, Jefferson County Records Access office to report that I had not received documents approved for release by him.

51. **August 25, 1996**, I received a letter from Jefferson County Deputy Administrator, Scott Schraeder, expressing his displeasure with my FOI requests. **Exhibit G(10)**

52. **August 28, 1996**, I wrote to Mr. Hagemann, Administrator, Jefferson County, to request a meeting after attempting to reach him by telephone. I stated the purpose of the meeting was to disclose possible inappropriate billing by Jefferson County officials. **Exhibit G(11)**

53. **September 4, 1996**, Medicaid Fraud investigators from the Syracuse Office, Lynn Foster and Paul Pendergast came to CREST to meet me and begin their investigation. **Exhibit G(12)**

*PRIVILEGED AND CONFIDENTIAL*

54. **September 16, 1996**, A letter from Mr. Hagemann acknowledged my allegations of Medicaid fraud and my intentions to pursue corrective action. He suggested scheduling a meeting. **Exhibit G(13)**

55. **September 16, 1996**, A letter was received from Mike Robare, Account Clerk for Jefferson County Community Services, regarding disallowed billings.

56. **September 17, 1996**, A letter was received from NYSED notifying me that CREST's 4410 preschool would be closed on November 1, 1996. **Exhibit G(14)**

57. **October 2, 1996**, A letter was received from NYSED PSRU reducing 1993-1994 tuition rates based on Mr. Tingley's comment letters.

58. **October 3, 1996**, A meeting was held between Mr. Hagemann, County Administrator, Mr. Michael Looby, Esq., County Attorney, myself as CREST representative, and CREST's attorney, Mr. Robert Slye, Esq. Medicaid billing improprieties were disclosed with a request for the Administration to intervene, investigate, and cease and desist Mr. Tingley's illegal actions. **Exhibit G(15)**

59. **November 1, 1996**, A letter to NYSED from Mr. Tingley disputing CREST Mainstream's 1994-1995 cost reports.

60. **November 4, 1996**, Mr. Tingley wrote to NYSED to inform them if CREST was closed, there was adequate room in other programs for displaced students.

61. **November 5, 1996**, A hearing was held to determine if CREST could remain open.

62. **December 5, 1996**, NYSED notified me that as part of the hearing, CREST would be subject to a five (5) year fiscal audit. **Exhibit G(16)**

63. **December 16, 1996**, CREST billed Jefferson County for services provided to preschool students during 1995-June 30, 1996.

*PRIVILEGED AND CONFIDENTIAL*

14

changed daily from late March until May 1. Faxed audit adjustments increased by thousands of dollars and ultimately by hundreds of thousands of dollars, sometimes on an hourly basis. I was also informed that Mr. Tingley had received draft audit figures from NYSED that he was using for calculations prior to completion of the audit. At the close of the meeting, the Chief auditor, Mike Abbott, asked me how much Jefferson County owed CREST. I was petrified and said *"Well, I'm reluctant to tell you for fear you'll up the ante."* I then apologized and told them $ 530,000.00. He later asked if I would be financially viable after paying the $ 350,000.00 he quoted earlier. I asked him what financially viable was and he explained the corporation would have enough capital to operate. I then replied, *"Yes, I believe we will be."*

72.   **May 1, 1997**, The NYSED audit was complete but not final as CREST requested an audit review.

73.   **May 22, 1997**, Jefferson County sent a memo to me stating *"we need Medicaid information as listed below in order to further process tuition billings for those students effected".*

74.   **May 23, 1997**, NYSED PSRU Chief, Thomas Hamel, released the <u>recalculated</u> rates as a result of the audit **before** the audit review was complete (8/14/97). In addition, he disallowed an additional $ 244,000.00 through manipulation of growth screens, total cost screens, and applied revenue. The total disallowed expenses for CREST was approximately $ 878,000.00.

75.   **June 2, 1997**, An audit review request was submitted by CREST attorney, Pamela Madeiros, Esq. and CREST CPA, Dale Buschmann.

76.   **July 2, 1997**, A memo was received from Mike Robare, Account Clerk for Jefferson County Community Services, stating he had applied current claims under non-4410 preschool contracts to the balance owed by CREST to the County as a result of the NYSED audit. Amount due to the County was fully recovered.

77.   **July 9, 1997**, A memo from me was sent to Mike Robare as a cover sheet for Medicaid form submissions.

78.    **July 11, 1997**, A letter was sent to NYSED counsel from CREST's attorney, Pamela Madeiros, Esq., objecting to Jefferson County's actions in recovering funds due CREST before the audit was final. **Exhibit H(7)**

79.    **July 17, 1997**, I received a copy of a NYSED interagency note from Mike Plotzker to Dan Johnson relayed to Tom Inkpen instructing Frank Hermon, NYSED Regional Associate, to investigate a verbal complaint by Jefferson County.

80.    **August 14, 1997**, A review of audit findings was complete.  A NYSED Review Panel of three (3) people sustained the audit findings and ordered CREST to re-pay $ 634,382.00 in disallowed tuition expenses.

81.    **September 1997**, CREST attorney, Pamela Madeiros, Esq., applied for a waiver of growth and cost screens to NYSED PSRU Chief, Thomas Hamel.

82.    **November 20, 1997**, NYSED Deputy Commissioner, Richard Cate, issued an order to close CREST based on a **"draft"** financial report for 1995-1996 prepared by CREST CPA, Dale Buschmann,  determining that CREST was not financially viable.  Mr. Sheldon, NYSED Hearing Officer, however, alone held the authority to close the school.

83.    **November 20, 1997**, I called Medicaid Fraud Investigator, Lynn Foster, crying.  I asked him *"How can they do this to me? I've been a good citizen by reporting this fraud and this is what happens to me.  It wasn't enough they stole all my money, now they're closing my business. Isn't there anyone there who can help me?"*.  He told me the investigation was continuing but he could neither tell me what was happening, what course he expected, or when he could share information with me.

84.    **November 21, 1997**,  The order to close the preschool was retracted following inquiries by a local reporter.  In Mr. Cate's own words he termed the closure order premature and a "screw-up".

85.    **November 24, 1997**, I asked to be added to the Jefferson County Health and Human Services Committee agenda with the intention of publicly disclosing information regarding Mr.

Tingley's negligence and retaliation toward my agency in response to my disclosures regarding his Medicaid billing practices. **Exhibit H(8)**

86.    **November 24, 1997**, I wrote to Mr. Hagemann to inquire about what actions they had taken as a result of disclosures I a made on October 3, 1996. **Exhibit H(9)**

87.    **November 24, 1997**, Thomas Hamel, NYSED PSRU, instructed Frank Hermon, NYSED Regional Associate, to inform Jefferson County school districts by telephone of CREST's closure and that they should find other providers under all contracts. No retraction was officially made to the districts, although the newspaper printed Mr. Cate's quotes retracting the closure.

88.    **November 24, 1997**, Belleville Henderson School District wrote to inform me a student would be taken out of CREST. **Exhibit H(10)**

89.    **December 1, 1997**, Indian River School District wrote a letter to parents informing them that CREST would not be providing services. **Exhibit H(11)**

90.    **December 3, 1997**, I wrote a letter to Mr. Cate and asked him to explain his course of action regarding the closure of my school and loss of contracts. **Exhibit H(12)**

91.    **December 4, 1997**, I asked Mr. Tingley to relate to the school districts that CREST has separate and distinct contracts unaffected by possible closure of the 4410 preschool program. He refused to inform them. I faced a $ 150,000.00 loss from one (1) school district due to the actions of the NYSED and refusal of Mr. Tingley to clarify contracts. After much effort, I contacted school Superintendents and school board members to beg them to intervene. Luckily, they did and CREST clients were retained. **Exhibit H(13)**

92.    **December 4, 1997**, I wrote a letter to Ms. Mary Anne Dobmeier, Indian River CPSE Chairperson, regarding cancellation of CREST services in an attempt to change her mind. **Exhibit H(14)**

93.     **December 5, 1997**, I received a letter from Ms. Dobmeier noting a change of providers.  **Exhibit H(15)**

94.     **December 8, 1997**, I wrote a letter to Indian River Central School District Board President explaining the problems and asking for intervention.  **Exhibit H(16)**

95.     **December 9, 1997**, I received a letter from Ms. Dobmeier retracting the change of providers.  **Exhibit H(17)**

96.     **December 17, 1997**, I wrote a letter Ms. Carol Kendall, NYSED Regional Associate, requesting clarification with regards to contracts.  **Exhibit H(18)**

` 97.     **December 22, 1997**, In a letter, Mr. Hagemann referred to my previous disclosures and inquiries as informal and suggested that I put my charges in writing and submit all factual information regarding the charges to his office. **Exhibit H(19)**

### 1998

98.     **January 28, 1998**, I wrote a letter to Mr. Tingley requesting contract clarification. **Exhibit I(1)**

99.     **February 1998**, I shared information with my Legislator, Joe Butler, regarding false claims under Medicaid which he took to Mr. Hagemann, County Administrator, and Mr. Looby, Esq., County Attorney.  They convened an "Ad Hoc" meeting to include David Converse, Chairman of the Health and Human Services Committee.

100.    **March 5, 1998**, An addendum to the July 30, 1998 complaint was sent to the Inspector General. **Exhibit I(2)**

101.    **March 5, 1998**, I wrote to NYSED and NYSDSS to request an investigation into Mr. Tingley's billing practices. **Exhibit I(3)**

*PRIVILEGED AND CONFIDENTIAL*

102.   **March 6, 1998**, As a result of the "Ad Hoc" meetings in February 1998, Mr. Looby, Esq., sent a memo to Mr. Tingley instructing him to review and assemble documents in defense of my allegations.   **Exhibit I(4)**

103.   **April 1998**, Mr. Hamel, NYSED PSRU, wrote to CREST's CPA firm to inform them I was not financially viable and his decision was final.

104.   **April 28, 1998**, I wrote to Mr. Hagemann to request information about the "Ad Hoc" meeting previously held to review the propriety of Mr. Tingley's Medicaid billing practices.  I also requested additional information and stated that I had been informed that over $ 101,000.00 would be repaid to the Federal Government. **Exhibit I(5)**

105.   **May 1998**, Mr. Sheldon, NYSED Hearing Officer, determined CREST could remain open.

106.   **May 1, 1998**, I sent information to Mr. Darrel Aubertine, Chairman of the Jefferson County Board of Legislators, following a telephone call to him wherein I disclosed information regarding illegal Medicaid billing practices by Mr. Tingley, the ongoing Medicaid Fraud investigation and reprisals against me.  I asked that disciplinary measures be taken against Mr. Tingley for his clearly illegal and negligent actions. **Exhibit I(6)**

107.   **May 11, 1998**, Mr. Hagemann wrote to me regarding Medicaid billing procedures indicating that $ 101,005.00 had been inappropriately billed due to my inadequacies.  I contacted my Legislator, Joe Butler, and told him that Mr. Tingley was well aware of his illegal actions, that I openly questioned his actions since 1994 and felt he should be disciplined.  Mr. Butler told me the "Ad Hoc" committee had found no basis to discipline him because they had no proof he knew. **Exhibit I(7)**

108.   **May 12, 1998**, I received a letter from Mr. Hagemann assuring me there would be no retributions against me or my agency due to Medicaid billing inquiries. **Exhibit I(8)**

109.   In a conversation with Mr. Butler, I referred to all the documents that I had supplied.  I asked if the jurisdictional committee, and/or Health and Human Services Committee, had been

*PRIVILEGED AND CONFIDENTIAL*

informed, asked if the Finance and Rules Committee had been informed of the repayment, and questioned if the outcome would be discussed during the budget meetings.

110.    I stated my concerns to Mr. Butler that Mr. Tingley continues billing for services that are not covered, has not consulted the HCP's and only glossed the surface of his impropriety in repayment of the $101,005.25.

111.    As a result of my investigations, I have discovered that by or under Mr. Tingley's direction, Medicaid has been fraudulently billed for unauthorized preschool services, approximating the following revenues:

| | |
|---|---|
| $   370,000.00 | 1993-1994 reported |
| $   490,000.00 | 1994-1995 reported |
| $   570,000.00 | 1995-1996 reported |
| $   650,000.00 | 1996-1997 estimate |
| $   700,000.00 | 1997-1998 estimate |
| $   700,000.00 | 1998-1999 estimate |
| $3,480,000.00 | |

112.    Mr. Tingley knowingly billed Medicaid for speech services that were not provided by or "under the direction" of speech pathologists and for services that were not medically necessary as mandated under Medicaid and NYSED regulations.

113.    Mr. Tingley knowingly billed Medicaid fraudulently, using information from contractors which he knew did not meet Medicaid Reimbursement requirements, acted in deliberate ignorance of the truth and falsity of the information, and acted in reckless disregard of the truth and falsity of the information.

114.    I have also contracted with the Watertown City School District, Watertown, New York, and Jefferson-Lewis BOCES, Arsenal Street, Watertown, New York. These agencies also bill Medicaid under the same premise.

Case 7:98-cv-01929-TJM-DEP· Document 24   Filed 04/20/01   Page 17 of 18   .

20

115.    The NYSED reaps millions of dollars in fraudulently obtained Medicaid benefits from school districts and agencies across New York State.  They conspired to establish policies and procedures that enable "Providers" to obtain illegal funds for their gain.  The NYSED's failure to appropriately regulate these policies and procedures and to allow widespread abuse makes them as guilty, as the "Providers" who fraudulently bill for services.

116.    It was obvious in my telephone conversations with Bill Smith, Project Assistant for Medicaid in the Educational System, on March 13, 1995 and May 3, 1996, and our meeting of July 14, 1996, that the NYSED was trying to conceal their revenue generating scheme by quelling dissidents like me.

117.    Although I have not named the NYSED, Lewis County, Jefferson-Lewis BOCES, or many local School Districts, as Defendants in the instant case, I would like to reserve the right to original source in any future cases against them or other States using the same scheme.

118.    Mr. Tingley fraudulently billed the Department of Health and numerous insurance companies for services provided to children under the Early Intervention Program. He instructed his staff to bill Medicaid for services provided by Speech Teachers who were not under the direction of Speech Pathologists.  Even in the instance when a Speech Pathologist was overseeing the services of a Speech Teacher, DOH regulations clearly state that only Speech Pathology services are reimbursable under Medicaid.  Speech Teachers are not appropriately and Medically licensed.   Mr. Tingley instructed his staff to "change " the providers from speech teachers to pathologists to enable Medicaid billing despite the fact the child's "medical" condition had not changed and most of the children had not been evaluated by a Speech Pathologist, which is required for Medicaid reimbursement.  The Jefferson County Community Services Department under Mr. Tingley's direction informed all providers that special instruction in speech, would no longer be available.  The only available "speech" service was Speech Pathology.  All of the children receiving the services of a Speech Teacher (non-reimbursable) were referred to Speech Pathologists (reimbursable).

119.    If any of the foregoing allegations "1" - "118" both inclusive are deemed to be conclusions only, plaintiff alleges that she is in possession of voluminous documentation which is too cumbersome to incorporate in this pleading, but which is readily available and will be submitted in support of the complaint when necessary and appropriate.

*PRIVILEGED AND CONFIDENTIAL*

Hedy M. Cirrincione, President

CREST Mainstream, Inc.
715 Washington Street
Watertown, New York 13601
Telephone: (315) 782-2274

Date: _4/20/01_                                        Plantiff

*PRIVILEGED AND CONFIDENTIAL*